FILED
2007 Jan-08  PM 03:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DAN CALLOWAY,                                        )

      PLAINTIFF,                              )

VS.                                                              )                     2:06-cv-00129-JHH

SELECT MEDIA SERVICES, LLC.,  )

## MEMORANDUM OF DECISION

The court has before it the October 16, 2006 motion (doc. #29) of defendant Select Media Services, LLC ("Select Media") for summary judgment.  Pursuant to the court's October 23, 2006 order (doc. #31), the motion was deemed submitted, without oral argument, on November 27, 2006.

## I. Procedural History

Plaintiff Dan Calloway commenced this action by filing a complaint in this court on January 20, 2006, alleging that his former employer, defendant Select Media, violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, by denying him continued employment after an on-the-job injury and failing to reasonably accommodate him by extending him disability leave for up to one year as provided in defefendant's Merchandiser Handbook.  (See Compl. ¶¶ 24, 25.)

1

Defendant's October 16, 2006 motion (doc. #29) for summary judgment asserts that: (1) defendant did not have a duty to provide a reasonable accommodation to plaintiff, because plaintiff never made a specific demand for a reasonable accommodation; (2) plaintiff's proposed, after the fact accommodation, is not reasonable; and (3) plaintiff is not a qualified individual with a disability within the ADA and therefore cannot make a prima facie case of employment discrimination under the ADA.  (See Def.'s Mot. for Summ. J. at 5.)

On October 16, 2006, defendant filed a brief (doc. #30) and evidence[1] in support of its motion.  Plaintiff filed a response (doc. #32) and evidence[2] (doc.

---

[1] Defendant submitted the following evidence: the complaint (Exh. A), the worker's compensation complaint filed in the circuit court of Jefferson County (Exh. B.), the deposition of Dan Calloway with exhibits (Exh. C), a vocational rehabilitation assessment report by Jo Spradling dated April 10, 2006 (Exh. D), various doctors' notes and files regarding plaintiff's medical history (Exh. E), the deposition of Dr. Kenneth Bramlett taken in conjunction with the state court worker's compensation case (Exh. F), emails to and from Dan Calloway regarding his medical condition (Exhs. G and H), Plaintiff's Response to Interrogatories and Request for Production of Documents (Exh. I), letter from Dan Calloway to Select Media regarding return to work release status (Exh. J), the Select Media Services, Inc. Merchandiser Handbook (Exh. K), the Select Media Services Home Depot Merchandising Instructions (Exh. L), and the deposition of Jo Spradling (Exh. M).

[2] Plaintiff submitted the following evidence: medical records from Dr. Kenneth Bramlett (Exh. A), affidavit of Dan Calloway (Exh. B), Defendant's Responses to Plaintiff's First Request for Admissions (Exh. C), Defendant's Responses to Plaintiff's First Interrogatories (Exh. D), Defendant's Responses to Plaintiff's Request for Production of Documents (Exh. E), the affidavit, resume, and vocational assessment report of Jo Spradling (Exh. F), sworn testimony of Eric Anderson and records pertinent thereto (Exh. G), records of the Department of Industrial Relations regarding plaintiff's claim for unemployment compensation (Exh. H), the deposition of Jane Smith with selected exhibits (Exh. I), deposition of Pam Cervantez (Exh. J), and the deposition of Charles Burnham (Exh. K).

#33) in opposition to the motion on November 17, 2006.  Defendant filed a reply

brief (doc. # 34) to plaintiff's opposition on November 27, 2006.[3]

The motion (doc. #29) for summary judgment is considered herein.

## II. Standards for Evaluating a Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings that the moving party believes

demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477

U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the

---

[3]Attached to the reply brief were two exhibits not previously submitted: plaintiff's unemployment hearing transcript and plaintiff's testimony at his worker's compensation trial. Also attached to the reply brief was the complete deposition testimony of Pam Cervantez, which had previously been submitted by plaintiff.  (See Exh. J. to Pl.'s Evidence Submitted in Opp'n. to Def.'s Mot. for Summ. J.)

On November 28, 2006, plaintiff filed a motion (doc. #35) to strike defendant's reply in its entirety, along with the attached exhibits.  That motion (doc. #35) was denied by court order (doc. #37) dated December 4, 2006.

nonmoving party to go beyond the pleadings and by her own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific

facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are

irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman,

229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable

inferences are resolved in favor of the nonmovant.  Chapman, 229 F.3d at 1023;

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If

the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.  Anderson, 477 U.S. at 249-50.  The method used by the

party moving for summary judgment to discharge its initial burden depends on

whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2

F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d

1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at

trial, then it can only meet its initial burden on summary judgment by coming

forward with positive evidence demonstrating the absence of a genuine issue of

material fact (i.e. facts that would entitle it to a directed verdict if not controverted

4

at trial).  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant,

5

sufficient to withstand a directed verdict, or the nonmoving party may come

forward with additional evidence sufficient to withstand a directed verdict motion

at trial based on the alleged evidentiary deficiency.  However, when responding,

the nonmovant can no longer rest on mere allegations, but must set forth evidence

of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v.

Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Select Media, based out of Atlanta, Georgia, provides distribution services

for book and magazine publishers to specialty retailers such as The Home Depot

and Staples in the United States.  (See Pl.'s Response to Def.'s Mot. for Summ. J.

at 3.)  Plaintiff has worked for Select Media since at least 1999 as a part time

merchandiser.  (See Calloway Dep. at 9; see also Exh. B to Def.'s Reply to Pl.'s

Response to Def.'s Mot. for Summ. J. at 32, 67, 69-70.)  He was an experienced

merchandiser at that time, having worked in the same job for Creative Homeowner

Press for over 10 years.  (See Calloway Dep. at 11.)  Both jobs required the same

basic duties – merchandising books and magazines, resetting the store, labeling

products, completing vendor returns, and generating orders.  (See id. at 10-11.)

---

[4] If the facts are in dispute, they are stated in the manner most favorable to the nonmoving
party.  See Fitzpatrick, 2 F.3d at 1115.

The most physical part of the job at Select Media is the actual merchandising of books and magazines.[5]  (See id. at 13-14.)  Merchandising requires physically lifting and moving 6 to 8 cartons of books or magazines per day, each carton weighing approximately 50 to 75 pounds each.[6]  (See id. at 14-16; see also Def.'s Exh. B to Def.'s Reply to Pl.'s Response to Def.'s Mot. for Summ. J. at 35.)

While working for Select Media, plaintiff experienced two on-the-job injuries that affected his left shoulder.  In June 2003, plaintiff was processing an order at The Home Depot in Trussville when a shopping cart stacked high with boxes of merchandise rolled, causing the boxes to fall across plaintiff's arm and injure his left shoulder.  (See Calloway Dep. at 25, 28.)  He was on leave from work for approximately six months following this injury.  (See Def.'s Exh. B to Def.'s Reply to Pl.'s Response to Def.'s Mot. for Summ. J. at 39, 87-88.)  On August 23, 2004, plaintiff was lifting boxes and setting then down to a lower height at The Home Depot in Pelham when he pulled his left shoulder again.[7]  (See

---

[5] Approximately twice a year plaintiff was also required to relocate racks, which meant handling 15 to 20 boxes of 50 to 75 pound cartons and dragging heavy racks to a different store location.  (See Calloway Dep. at 14-15.)

[6] Plaintiff typically performed this task by loading entire boxes or cartons into a shopping cart and transporting them on to the racks.  (See Calloway Aff. at ¶ 3; see also Calloway Dep. at 15-16.)

[7] Plaintiff states that the pain from the June 2003 injury was "pretty much the same" as the pain from the later August 2004 injury.  (See Calloway Dep. at 38, 47.)

id. at 43; see also Calloway Dep. at 32.)

Later on August 23 or the next afternoon, plaintiff contacted Pam Cervantez, the district manager for Select Media, and informed her that he had been injured on-the-job.  (See id. at 33-34.)  The ensuing week at work, plaintiff was unable to fulfill all of his job responsibilities.  (See id. at 65.)  He was unable to lift boxes above his shoulders or above "a certain range."  (Id. at 65, 67.)

Due to the sharp and intermittent pain and numbness plaintiff continued to experience in his left shoulder during the week immediately after the August 23 injury, plaintiff consulted with Dr. Kenneth Bramlett on August 30, 2004.  (See id. at 35-36; see also Bramlett Dep. at 10.)[8]  Plaintiff reported to Dr. Bramlett that the pain in his left shoulder started when a box fell on him in June 2003.[9]  (See Bramlett Dep. at 12; see also Def.'s Exh. E to Mot. for Summ. J. at 1.)[10]  Dr. Bramlett concluded upon examination that plaintiff was experiencing "end stage

---

As a result of the August 23, 2004 injury, plaintiff filed a complaint for worker's compensation benefits in state court.  (See Def.'s Exh. B to Mot. for Summ. J.)  A final judgment has not yet been issued in that case.  (See Def.'s Mot. for Summ. J. at 2.)

[8] Dr. Bramlett was deposed as part of the discovery in the worker's compensation case. (See Def.'s Mot. for Summ. J. at 4.)

[9] However, plaintiff testified in the worker's compensation case that he did not in fact have pain in his left shoulder prior to the August 2004 injury.  (See Def.'s Exh. B to Def.'s Reply to Pl.'s Response to Def.'s Mot. for Summ. J. at 106.)

[10] The pages of defendant's exhibit E are not Bates labeled or numbered.  For purposes of this Memorandum Opinion, the court has numbered those pages consecutively.

joint disease of the shoulder with acromioclavicular arthritis."[11]  (Bramlett Dep. at 13.)  He scheduled plaintiff for "a decompression and clavicle resection arthroscopically" and performed that surgery on plaintiff's left shoulder on September 10, 2004.  (See id. at 14; see also Calloway Dep. at 48-50.)

Plaintiff never returned to work at Select Media after the September 2004 surgery.  (See Calloway Dep. at 70.)  On January 6, 2005, Dr. Bramlett met with plaintiff and thereinafter a partner in Dr. Bramlett's practice noted that plaintiff was still unable to do overhead lifting and had significant crepitation[12] and grinding in his left shoulder.  (See Bramlett Dep. at 25.)  On January 7, 2005 plaintiff sent an email to Cervantez, updating her on his injury status.  (See Calloway Dep. at 72; see also Def.'s Exh. 3 to Calloway Dep.)  He states that he "will not be able to return to work at this time" but that he "hope[s] this situation [will] clear up so that [he] will be able to return at a future date."  (Def.'s Exh. 3 to Calloway Dep.)  Cervantez sends a reply email dated January 8, 2005.  "I am sorry to say, but at this time I have no other choice but to move forward and hire someone else to take your stores.  You were a great contributor to this companies

---

[11] Basically, "the ball and socket is work out [from wear and tear, time] and the clavicle joint is also worn out [from wear and tear, time]."  (Bramlett Dep. at 13.)

[12] Crepitation is a condition in which the bones rub together and cause irritation.  (See Bramlett Dep. at 25.)

[sic] success, and I enjoyed working with you the time I did."[13]   (Def.'s Exh. 3 to

---

[13] There is a dispute in the record as to whether this email exchange constituted a resignation on the part of Calloway or the termination of Calloway's employment by Select Media.  Defendant denies that it terminated plaintiff's employment in its Responses to Requests for Admissions, affirmatively stating that "defendant did not terminate plaintiff's employment, rather plaintiff resigned his position."  (Pl.'s Exh. C to Pl.'s Evidence Submitted in Opp'n. to Def.'s Mot. for Summ. J. at no. 2.)  However, Cervantez testified that Calloway never told her that he was resigning, and Smith testified that no one gave her any information other than the email referenced above that calloway was resigning.  (See Cervantez Dep. at 72-73; see also Smith Dep. at 57-58.)

Since there is a dispute in the record on this point, the court will take as true plaintiff's assertion that he did not resign his employment with Select Media.  (See Calloway Dep. at 71; see also Exh. I to Def.'s Mot. for Summ. J. at no. 8.)  "I wanted to go back to work.  The doctor released me to go back to work.  And I've sent that in, sent that notice to Pam Cervantez and also to the human resources, Jane Smith.  And then I got a reply back from Pam that they had to replace me."  (Id. at 72.)  "I assumed that if I was terminated and the job was filled, that they did not have anything to offer me."  (Id. at 104.)

There is not, however, a viable dispute in the record as to whether plaintiff's employment with Select Media ended (whether by plaintiff's action or Select Media's action) in January 2005.  Although plaintiff attempts to create such a dispute, the plain language of the email exchange is clear.  (See Def.'s Exh. 3 to Calloway Dep.)  Moreover, plaintiff clearly testified in his unemployment hearing that he did not consider himself to be employed with Select Media as of January 8, 2005:

| | |
|---|---|
| Hearing Officer: | Mr. Calloway?  I guess the most important thing that I have to ask, sir, is that why you did not contact your employer in response to Miss Cervantez notice that you had been replaced? |
| Calloway: | I was never required to.  There was nothing in the manual stating that it was a requirement. |
| Hearing Officer: | Did you understand that to mean your employment was terminated as on January the 8th, sir? |
| Calloway: | Yes, based on the response of Miss Cervantez. |
| . . . | |
| Hearing Officer: | I will try to rephrase that.  My question is, if you understand that to mean that you were terminated as of your response from Miss Cervantez on January the 8th. |

Calloway Dep.)

Despite the fact that plaintiff considered his employment with Select Media terminated as of January 2005, he continued to send medical records and updates to Select Media.  (See Calloway Dep. at 74.)  When Dr. Bramlett finally released plaintiff back to work in June 2005 "full duty with no restrictions,"[14] plaintiff sent the release to work information to Select Media via fax.  (See Calloway Dep. at 55, 73-74, 94, 100-101, 106; see also Bramlett Dep. at 40-41.)  After receiving no response to that fax, plaintiff sent Select Media a letter, via certified mail, attaching the release to work form and requesting that he be allowed to return to work.[15]  (See Exh. J to Def.'s Mot. for Summ. J.)

_____

Calloway:      Yes.

(Def.'s Exh. A to Def.'s Reply to Pl.'s Response to Def.'s Mot. for Summ. J. at 22-23.)

Plaintiff cannot now, in response to defendant's motion for summary judgment, assert that "a reasonable jury could find that if plaintiff did not resign [as defendant has admitted], and if defendant did not terminate plaintiff's employment [as defendant has denied], plaintiff was still employed when he sought to return to work and as such the only relevant time period [to consider the ADA claim] was June 2005, after he was released to return to work."  (Pl.'s Response to Def.'s Mot. for Summ. J. at 35.)

[14] Despite this unequivocal return to work slip, Dr. Bramlett testified during the course of his deposition that "[Calloway] has common sense enough to know that . . . if he is picking up 25 pounds with his left arm, probably not going to happen.  Just leave it at that.  Otherwise he would be able to return to full duty and be careful in what he is doing.  If he can work within his realm of his workplace."  (Bramlett Dep. at 51.)

[15] The return to work form was not attached to a re-application to return to work at Select Media.  (See Calloway Dep. at 103-104.)

Having still received no reply to his letter and fax, plaintiff applied for unemployment compensation on July 17, 2005.[16]  (See Exh. H to Pl.'s Response to Def.'s Mot. for Summ. J.)  The unemployment compensation application indicates that plaintiff is mentally and physically able to work.  (Id.)  When contacted by the Alabama Unemployment Agency, Select Media's representative, Jane Smith (Supervisor, Human Resources), stated that since medical documents were received with no return to work date, it was decided that plaintiff's employment would be terminated and a replacement would be hired.  (Id. at Bates No. 405.)  At the same time, Smith indicated to the unemployment agency that since plaintiff was a part-time employee, no medical leave of absence was applicable,[17] but that plaintiff could be rehired depending on work availability.[18]  (Id.)

---

[16] "The company would not let me return back to work.  The job had already been filled by someone else."  (Def.'s Exh. B to Def.'s Reply to Pl.'s Response to Def.'s Mot. For Summ. J. at 51.)

[17] In her deposition, Smith testified that the medical leave of absence policy *did* apply to plaintiff.  (See Smith Dep. at 117-118.)  Charles Burnham, Division Sales Manager for Select Media, testified that although he told the Equal Employment Opportunity Commission ("EEOC") that there was no disability leave policy applicable to plaintiff, he later testified in his deposition that he was mistaken in that regard and that the disability policy did in fact apply to plaintiff. (See Burnham Dep. at 27-31.)  Since there is some dispute on this point, for summary judgment purposes the court will take as true that the medical leave of absence policy contained in the handbook *was* in fact applicable to plaintiff.

[18] Charles Burnham testified that based on his knowledge of plaintiff's condition, he would be reluctant about hiring him because "I am afraid that he would not stay because he cannot physically perform the job . . ."  (Burnham Dep. at 51.)  However, plaintiff did not re-apply for a position with Select Media although he was in fact aware that Select Media welcomes employees who are gone longer than their approved period of leave to reapply.  (See Calloway

12

Plaintiff's position is that Select Media should have accommodated his injury by holding his job open indefinitely while he was unable to work and by allowing him to return to work in June 2005, with or without reasonable accommodation.  (See Calloway Dep. at 75.)  Calloway was given an employee handbook when he began working for Select Media, and had the expectation[19] that the rules and policies contained therein, including the disability leave of absence policy,[20] governed his employment.[21]  (See id. at 98-100.)  Moreover, plaintiff's

_____

Dep. at 104.)

[19] Apparently, plaintiff had this expectation despite the fact that "he never reviewed the handbook and no one from the company went over the handbook with him."  (Pl.'s Response to Def.'s Mot. for Summ. J. at 4.)

[20] The "Disability (Including Pregnancy) Leave of Absence" section of the handbook is set forth on page 14.  (See Pl.'s Exh. 1 to Calloway Dep.) (emphasis added).  That policy provides:

> Select Media Services *may* grant an unpaid leave of absence for illness, disability or pregnancy according to applicable state regulations.  To request a disability leave of absence from your supervisor, you should submit, or have someone submit for you, *a statement of ill health or disability from your doctor . . .* an approved disability leave will be granted for up to 90 days.  If necessary, you may request extensions in 30-day increments for a maximum of one year.  Whenever possible, you are required to give as much notice as possible of your pending need for a disability leave of absence.

> Employees who must remain away from work for more than the period of leave approved *may be considered terminated from employment*.  They are welcome to re-apply subject to Select Media Services usual hiring policies.

[21] Plaintiff admittedly did not submit to Select Media a statement of ill health of disability as set forth in the above-quoted disability policy.  (See calloway Dep. at 103.)  Plaintiff admittedly has not reapplied for a position at Select Media.  (See id. at 103-104.)

13

position is that if allowed, he could return to work at Select Media and perform the duties of a merchandiser, with certain limitations on his ability to maneuver heavy boxes and cartons of material up and over his head.[22]  (See id. at 64, 102.)

Jo Spradling performed a vocational rehabilitation assessment on plaintiff on or about April 6, 2006 at the request of plaintiff's attorney.  (See Spradling Dep. at 13; see also Def.'s Exh. D to Mot. for Summ. J.)  Spradling came to the conclusion "that considering his age, his educational background, and his work history, in conjunction with his reported physical limitations[23] as well as his

_____

[22] Plaintiff testified in the worker's compensation court proceedings:

Q:     Does the job of merchandiser necessarily involve relocating shelves?
A:     Yes.

Q:     All right.  And you think you can do merchandising work?
A:     Yes.

Q:     Why so?
A:     I feel like I could do some merchandising work if it didn't pertain to a lot of physical and strenuous lifting.

Q:     But it does, doesn't it?
A:     Yes.

(Def.'s Exh. B to Def.'s Reply to Pl.'s Response to Def.'s Mot. for Summ. J. at 54-55.)

[23] Plaintiff stated to Spradling "that he experienced trouble lifting and carrying objects with his left upper extremity that weighed greater than 25 to 30 pounds.  He stated he also had difficulty with overhead activities, that he was really unable to reach behind his back with his left arm and hold it there for any length of time.  He stated that he has ongoing pain and weakness in his left upper extremity.  He also stated that he's less active now than he was prior to the date of the injury."  (Spradling Dep. at 15-16.)

14

subjective complaints that he related to me, that I don't believe he is capable of returning to competitive gainful employment in the open labor market." (Spradling Dep. at 14-15.)  However, Spradling does believe that it is possible (not probable)[24] that plaintiff could perform supervisory-type jobs, jobs which would allow him to stay seated at work, as well as the job of merchandiser as long as he would not have to lift over his head in excess of 25 to 30 pounds.  (See id. at 44.)

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint alleges that Select Media discriminated against him by failing to accommodate his disability by refusing to place him on unpaid disability leave for up to one year and by refusing him to allow to return to work once his treating physician released him to return to work.  (See Compl. ¶¶ 24, 25; see also Pl.'s Response to Def.'s Mot. for Summ. J. at 3.)  Defendant's motion for summary judgment, as amplified in its brief in support thereof, asserts that: (1) defendant did not have a duty to provide a reasonable accommodation to plaintiff, because plaintiff never made a specific request for a reasonable accommodation; (2) plaintiff's proposed, after the fact accommodation is not reasonable; and (3) plaintiff is not a qualified individual with a disability within the ADA and

---

[24] "I, again, think that it's possible.  I don't think that it's very probable, but certainly I think it is a possibility.  But it would depend on, of course, his capacity to return to that and then maintain that for at least six to eight months."  (Spradling Dep. at 44-45.)

therefore cannot make a prima facie case of employment discrimination under the ADA.  (See Def's Mot. for Summ. J. at 5.)

**A.    Basics of the Americans with Disabilities Act**

The Americans with Disabilities Act ("ADA") provides that employers shall not discriminate against qualified individuals with a disability because of that disability.  42 U.S.C. § 12112(a).  In order to establish a prima facie case of discrimination under the ADA, the plaintiff must show that: (1) he is disabled; (2) he was a qualified individual at the relevant time; and (3) he was discriminated against because of his disability.  See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

**B.    Plaintiff Claims that Select Media Violated the ADA by Failing to Extend Plaintiff Disability Leave for Up to One Year as Provided in the Merchandiser Handbook**

**1.    The Duty to Accommodate**

An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability – unless doing so would impose undue hardship on the employer.  42

16

U.S.C. § 12112(b)(5)(A); see also Lucas, 257 F.3d at 1255.  "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions."  Id. at 1255-56; see also Earl v. Mervyn's, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000) and Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997).  An employee's failure to request a reasonable accommodation is fatal to the prima facie case; "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."  Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999); see also Warren v. Volusia County, Florida, 188 Fed. Appx. 859 at *863, No. 05-16411 (11th Cir. July 5, 2006).

Plaintiff believes that he was entitled to the disability leave of absence as defined in the Merchandiser Handbook, despite the fact that he never specifically requested this accommodation *and* despite the fact that he did not complete the paperwork necessary to implement that accommodation.  (See Pl.'s Response to Def.'s Mot. for Summ. J. at 38-39; see also Exh. I to Def.'s Mot. for Summ. J. at no. 33 and Calloway Dep. at 103.)  Plaintiff believes he was effectively exempt from the Act's specific mandate because "defendant had known since September 10, 2004, when plaintiff had surgery and was taken off work that he had a serious

disability that prohibited him from working.  Plaintiff updated defendant

periodically as he was seen by his doctor to advise defendant of his work status."

(Pl.'s Response to Def.'s Mot. for Summ. J. at 40.)  This "notice," plaintiff argues,

triggered the employer's duty to engage in the interactive process to help the

"disabled" employee devise accommodations.  (See id. at 42.)

	While plaintiff's theory is an interesting one, it has heretofore been

considered and rejected by the Eleventh Circuit.  In Warren, plaintiff was injured

in a work-related accident, which exacerbated her pre-existing rheumatoid

arthritis.  188 Fed. Appx. at *860.  Although she returned to work on light duty,

she continued to take time off under the Family and Medical Leave Act and

requested numerous leaves of absences and short term disability due to her

condition.  See id.  She eventually hired counsel, sought worker's compensation,

and requested through her counsel that she be retrained for another position.  See

id.  The employer responded that plaintiff should speak with employee personnel

about open positions within her limitations.  See id.  Plaintiff failed to do so, and

in 2001 she was informed that her employment would be terminated due to the

extent of her leave.  See id.

	The Warren plaintiff argued that the termination of her employment

amounted to disability discrimination on the ground that she was not required to

18

use "magic words" to request an accommodation, and that the information from her physician was enough.  See id. at *861.  She argued that for a court to rule otherwise "places all the burden on the employee and no responsibility whatsoever on the employer."  Id. at *862.

Calloway's argument is strikingly similar to Warren's argument (and relies on *no* Eleventh Circuit case law).  Specifically, Calloway asserts: "in this case, plaintiff was not necessarily required to request an accommodation because defendant had known since September 10, 2004, when plaintiff had surgery and was taken off work that he had a serious disability that prohibited him from working.  Plaintiff updated defendant periodically as he was seen by his doctor to advise defendant of his work status . . . the Act requires the parties to engage in an interactive process to find a reasonable accommodation."  (Pl.'s Response to Def.'s Mot. for Summ. J. at 40, 42.)

Regardless of the employer's knowledge of plaintiff's condition, there is simply no duty to accommodate where a plaintiff does not request accommodation.  "Here, the evidence, viewed in the light most favorable to [plaintiff], established that [plaintiff] never requested any accommodation, either on her own or through a representative. [Plaintiff] herself admitted that she never requested an accommodation . . . And never inquired about open positions for

19

which she was qualified.  Contrary to [plaintiff's] argument, the burden is entirely on the plaintiff."  Id. at *863.

This court adopts the reasoning of the Eleventh Circuit and finds that defendant's motion for summary judgment is due to be granted because plaintiff failed to make a specific request for accommodation.

### 2.      The Reasonableness of the "Requested" Accommodation

Even were this court to disregard plaintiff's failure to make a specific demand for an accommodation, her claim under the ADA would nevertheless fail because the "requested" accommodation was not reasonable.  Although Select Media has in place a written policy affording disabled employees to take *up to* a one year leave of absence (after submission of a statement of ill health or disability and approval,)[25] the pertinent question before this court is whether it would be reasonable to require Select Media to keep a position open for six months to a year *without knowing whether plaintiff would actually be able to return to work at the conclusion of that year* and without having been asked to keep the position open. (See Calloway Dep. at 75.)  Although the Act sets forth that a reasonable accommodation may include "additional unpaid leave," the provision contains "no reference to a person's *future* ability to perform the essential functions of his

---

[25]See footnotes 17 and 20, supra.

position.  To the contrary, they are formulated entirely in the present tense,

framing the precise issue as to whether an individual 'can' (not 'will be able to')

perform the job with reasonable accommodations.  *Nothing in the text of the*

*reasonable accommodation provision requires an employer to wait for an*

*indefinite period for an accommodation to achieve its intended effect.*  Rather,

reasonable accommodation is by its terms most logically construed as that which,

presently, or in the immediate future, enables the employee to perform the

essential functions of the job in question."  Wood v. Green, 323 F.3d 1309, 1313

(11th Cir. 2003) (emphasis added), citing Duckett v. Dunlop Tire Corp., 120 F.3d

1222, 1226 (11th Cir. 1997).

On January 7, 2005, plaintiff sent an email to regional manager Pam

Cervantez, informing her: "[The doctor] checked my range of motion and it was

not very good.  Also, he indicated that I should refrain from lifting.  I will see the

doctor next week and it appears to him that the only solution is to have further

surgery on the shoulder.  *It looks at this time, based on the above, that I will not be*

*able to return to work at this time.  Hope this situation clear[s] up so that I will be*

*able to return at a future date*."  (Exh. G to Def.'s Mot. for Summ. J.) (emphasis

added).  Cervantez responded: "I am sorry to say, but at this time I have no other

choice, but to move forward, and hire someone else to take your stores.  You were

21

a great contributor to this companies [sic] success, and I enjoyed working with you the time that I did.  I wish you and your family the best." (Id.)

At the time of this email exchange, plaintiff had already been on leave from work for four months.  (See Calloway Dep. at 70.)  At no point does plaintiff express to Select Media that he will require an additional six months (or twelve months) to deal with his disability.  (See Exh. G to Def.'s Mot. for Summ. J.)  At no point does plaintiff express to Select Media that he will in fact be able to return to work.  (See id.)  At no point does plaintiff request a disability leave of absence in accordance with the procedure set for in Select Media's handbook.  (See Calloway Dep. at 103.)  He merely assumes, without so requesting, that Select Media will make the "reasonable" accommodation of keeping his job open for *at least one year* on the *hope* that he will be able to return to work at some date in the future.  (See Exh. G to Def.'s Mot. for Summ. J.)

While a leave of absence might be reasonable in some cases, Calloway was "requesting" an indefinite leave of absence.  He was not "requesting" an accommodation that allowed him to continue work in the present, but rather, in the future – at some indefinite time, and only on the "hope" that he would actually be able to return to work.  See Wood, 323 F.3d at 1314.  Such a "request" is not reasonable.

Therefore, defendant's motion for summary judgment is due to be granted

because plaintiff failed to make a specific demand for a reasonable

accommodation from Select Media.[26]

C.        **Plaintiff Claims that Select Media Violated the ADA by Failing to Re-Employ Plaintiff After he was Released to Return to Work - Full Duty**

Plaintiff's complaint asserts that "the conduct of the defendant's agents and

employees and ratification of said conduct alleged herein violates the Americans

with Disabilities Act because the plaintiff had an actual, record of and perceived

disability and was denied continued employment from a position he was already

performing prior to his injury." (Compl. ¶ 24.) Apparently, this allegation goes to

plaintiff's argument in brief that plaintiff was subjected to an adverse employment

decision in June 2005. (See Pl.'s Response to Def.'s Mot. for Summ. J. at 34-37.)

That is, that Select Media did not re-employ Calloway after he was released back

to work by Dr. Bramlett. (See id.)

The court adopts herein its discussion in footnote 13, supra, on the issue of

whether plaintiff's employment was in fact adversely affected (whether by

_____

[26]In light of the above summary, the court sees no reason to fully address defendant's third ground for summary judgment, that being that plaintiff is not a qualified individual with a disability in part because he is unable to perform the essential functions of the job. (See Def.'s Mot. for Summ. J. at 5.)

plaintiff himself or Select Media) in January 2005.  Plaintiff unequivocally testified that he did not consider himself to be employed with Select Media as of January 8, 2005.  (See Def.'s Exh. A to Def.'s Reply to Pl.'s Response to Def.'s Mot. for Summ. J. at 22-23.)  Therefore, the court must consider plaintiff's second claim (see Compl. ¶ 24; see also Pl.'s Response to Def.'s Mot. for Summ. J. at 3) as one for failure to hire in violation of the ADA.

This claim fails for a more fundamental reason than did the first.  Not only did plaintiff fail to make a request for a reasonable accommodation in June 2005,[27] he completely failed to re-apply for a position with Select Media despite the fact that he was aware that Select Media "welcomes employees who are gone longer than their approved period of leave to reapply."  (See Calloway Dep. at 103-104.) Thus, there was no adverse action (indeed, no action at all) taken by Select Media in June 2005.  No discrimination action can lie for failure to hire where plaintiff made no request to be hired.  See 42 U.S.C. §§ 12111-17.

---

[27]It is, of course, possible that the plaintiff was not disabled in June 2005 and therefore would not have needed any reasonable accommodation from Select Media at that time.  There was no reason for the court to decide whether plaintiff was a qualified individual with a disability in January 2005 as defined by the Act.  (See footnote 26, supra.)  Likewise, there is no reason for the court to engage in a lengthy analysis as to whether plaintiff was disabled in June 2005 since no adverse employment decision was made in June 2005.

In summary, the court finds that no material issue of fact remains and that defendant Select Media Services, LLC is entitled to judgment as a matter of law as to all claims asserted by plaintiff.  A separate order will be entered.

**DONE** this the ___8th___ day of January, 2007.

_____
SENIOR UNITED STATES DISTRICT JUDGE